## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

APPLYA CORPORATION,
a Delaware corporation,

Plaintiff,

v.

TBG TECH CO. LLC,
a Florida limited liability company,
and JOHANNES FLOE,

Defendants.

Civil Action No.: 1:23-cv-21290-DPG

## AFFIDAVIT OF FELIX MIRANDO

I, Felix Mirando, declare under penalty of perjury that the following is true and correct:

1. I am the Chairman of the Board of Directors of Applya Corporation, a Delaware corporation with its principal place of business in Greenville, South Carolina ("Applya"). I am over the age of 18 and competent to attest to the matters set forth herein. By virtue of my role with Applya, I am familiar with Applya's operations and its business dealings, including Applya's relationships and dealings with its suppliers and its customers. I am authorized to make this Affidavit on behalf of Applya and I make this Affidavit based upon my personal knowledge of the matters contained herein and records maintained in the ordinary course of Applya's business.

2. I have reviewed the Amended Complaint filed in this case. All of the facts set forth therein are true and correct, except any matters stated upon information and belief, and as to those matters, I reasonably believe them to be true. The exhibits to the Amended Complaint are true and correct copies of the referenced documents.

3. Applya is in the business of providing healthcare products and services to

governmental agencies, healthcare, and other types of customers.

4. During the COVID-19 pandemic, Applya's customers had a strong demand for personal protective equipment (also known as and hereinafter referred to as "PPE"), including nitrile gloves.

5. Applya looked to Defendant TBG Tech Co. LLC ("TBG") as a potential supplier of PPE. TBG, through Johannes Floe, represented to Applya that TBG had an established and reliable supply chain for nitrile gloves from Asian manufacturers.

6. In reliance on these representations, Applya entered into a series of transactions with TBG for the purchase of nitrile gloves. The Amended Complaint accurately sets out that Applya deposited a total of $2,611,249.92 of funds, by and through an escrow agent, that were ultimately transferred to TBG. It also accurately states that Applya never received a single nitrile glove from TBG or a refund of any of its money.

7. The first transaction Applya entered into was for the purchase of 1.3 million boxes of Société Générale de Surveillance certified nitrile gloves, also known as "Vgloves." Applya deposited $1,861,249.92 towards this purchase.

8. The Vgloves were to be inspected and certified by Société Générale de Surveillance ("SGS") prior to delivery. SGS is a company that provides inspection, verification, testing, and certification services for goods, including PPE. SGS certification is recognized in this industry as the gold standard of quality and integrity which, of course, was critical given the intended use of PPE and the infectiousness of the Coronavirus.

9. TBG produced a fraudulent SGS report to Applya. TBG's agents blamed the Vglove manufacturer for the fraudulent report and represented to Applya that they had another manufacturer who could supply their immediate need for nitrile gloves. These representations induced Applya to enter a second deal, this time for the purchase of 1,175,400 boxes of DI-LINE 24 Clean Energy Co,

Ltd. ("DiLine") gloves. Applya was told it needed to transfer an additional $750,000.00, which would be applied with the prior $1,861,249.92 deposit towards the purchase of DiLine gloves.

10. TBG never delivered any DiLine gloves. TBG's agents blamed the DiLine manufacturer for this as well and offered a host of other excuses for its inability to deliver the DiLine gloves.

11. In the interim, Applya secured significant purchase commitments from its customers for PPE. The purchase order attached hereto as Exhibit 1 is a true and correct copy of a purchase order SC Health SPV, LLC ("SC Health") entered into with Applya on or about April 30, 2021, whereby SC Health agreed to purchase 3.5 million boxes of Kingfa Science & Tech Co. Ltd. ("KingFa") nitrile powder-free gloves per month for a period of 24 months at a rate of $10.90 per box.

12. TBG's agents represented to Applya that TBG was also an authorized distributor and consignee of Kingfa gloves. See Reseller Agreement between Applya and TBG, a true and correct copy of which is attached hereto as Exhibit 2 at p. 1.

13. Based upon these representations and the purchase commitment from SC Health, Applya entered into a Reseller Agreement with TBG (Exhibit 2). As the Reseller Agreement reflects, TBG agreed to deliver 3.5 million boxes of KingFa gloves at a price of $9.00 per box. (See Ex. 2 at §§ 3.1.1.1, 4.1). Applya was provided the option to reduce its quantity order per month to 2.5 million boxes, such that 2.5 million boxes were considered the minimum order quantity. (Ex. 2 at § 3.1.1.1.1.1). The term of the Reseller Agreement was 3 years, unless earlier terminated. (Ex. 2 at § 10.1). There were no price escalations for KingFa gloves during the initial 3-year term. The price per box was $9.00 for the duration of the term.

14. The Reseller Agreement required Applya to deposit a security deposit in an amount equal to 15% of the minimum order quantity or $3,375,000.00. (Ex. 2 at § 4.4). However, TBG

acknowledged the fact that it was already in receipt of $2,611,249.92 of TBG's money pursuant to the prior, uncompleted orders for Vglove and DiLine products. (See Ex. 2 at §4.4.1 and Ex. A). TBG agreed that Applya was not required to fund the additional amount of the security deposit (+$763,750.08) unless and until TBG completed the first delivery of 1 million boxes of 100-count or greater KingFa gloves. (Ex. 2 at § 4.4.1).

15. TBG never delivered any KingFa gloves to Applya.

16. Accordingly, Applya had no ability to fulfill the SC Health purchase order.

17. As set out in the Exhibit 1 purchase order, SC Health committed to a total purchase commitment of $915,600,010.90 over a two-year period from May 2021 to April 2023, broken down monthly as follows:

| Quantity | | Price per Unit | Total |
|---|---|---|---|
| 3,500,000 boxes | x | $10.90 per box | = $38,150,000 for first 23 months |
| | | | *plus* |
| 3,500,001 boxes | x | $10.90 per box | = $38,150,010.90 for last month |
| | | **Grand Total** | **= $915,600,010.90** |

18. The SC Health purchase order was approved and executed by Alex Szaradek, the CEO of SC Health. (Ex. 1). It constitutes the contract between Applya and SC Health and as its terms provide, SC Health "published this Purchase Order with the full expectation that the terms represented will be adhered to." (Ex. 1). It was intended to "roll and extend indefinitely" beyond the initial 24-month term unless terminated, which had to be agreed upon in writing and with 30 days advance notice. (Ex. 1).

19. Had TBG complied with the terms of the Reseller Agreement and supplied the KingFa gloves, Applya would have made $1.90 per box at a volume of 3.5 million boxes per month. The $1.90 margin represents the difference between the price SC Health agreed to pay per box

pursuant to the Exhibit 1 purchase order ($10.90 per box) and the cost at which Applya would source the supply pursuant to the Exhibit 2 Reseller Agreement with TBG ($9.00 per box).

20. TBG's performance under the Reseller Agreement would have resulted in an additional $6,650,000.00 of revenue per month for Applya and, over the course of the initial term of the SC Health purchase order, $159,600,001.90 of additional revenue. The figure would only increase during rollover, extended terms of the SC Health purchase order.

21. Given TBG's failure to perform, Applya was not able to fulfill the SC Health purchase order.

22. During the period in question, and by and through suppliers other than TBG, Applya successfully completed other PPE transactions.

23. After accounting for transactional costs such as shipping costs, tariffs, duties, sales tax, and inventory variance, Applya's net profit margins on PPE transactions ranged from 31% (on nitrile gloves), 32% (on kN-95s), and 43% (on goggles).

24. Applying the 31% net profit margin realized on other nitrile gloves sales transactions, Applya lost $49,476,000.59 of profits as a consequence of TBG's breach.

25. When it became clear that TBG had no ability or intent to deliver the KingFa gloves and that TBG and its principals were engaged in a broader pattern of fraud, Applya demanded its $2,611,249.92 deposit be refunded.

26. TBG's principal, Floe, made false promises, on many occasions, that he would refund Applya's money. Despite further demands, the security deposit of $2,611,249.92 has never been returned.

27. The loss of the $2,611,249.92 deposit, much less lost profits, has seriously harmed Applya. Applya borrowed money to fund the $2,611,249.92. TBG's failure to deliver gloves or refund the deposit has caused Applya to default on repayment obligations. Applya's inability to

satisfy its customer's order has also caused Applya reputational harm.

28. The security deposits totaling $2,611,249.92 were initially deposited into the IOLTA trust account of Justin Brown Attorney at Law, a California lawyer who represents TBG. Attorney Brown and TBG have provided Applya with written documentation that the $2,611,249.92 initially placed in Brown's IOLTA trust account was all wired to TBG. A copy of this document is included in the Reseller Agreement (Exhibit 1), as Exhibit A thereto.

29. Applya has come to learn that TBG engaged in an intentional pattern of deceit and fraud, preying on the public and healthcare industry's emergency need for PPE during the pandemic. TBG did the same thing to others, including the Atlantic Corporation of Wilmington, Inc. (see case no. 1:21-cv-24317), causing that company millions of dollars in losses. TBG should be punished in a way that prevents it from causing other small businesses ruin.

30. Applya's damages as a result of TBG's actions include $49,476,000.59 of lost profits, attorneys' fees and costs associated with Applya's efforts to collect its losses, other lost opportunities due to the lack of cash, damaged customer and lender relationships, and other consequential damages that may be realized in the future, including any liability Applya is found to have to third-parties arising out of and related to the underlying transaction.

I declare under the penalty of perjury that the foregoing is true and correct.

This __7__ day of March, 2024.

_____
Felix Mirando

Sworn to before me this 7th
day of March, 2024

*Amy Williams*
Notary Public for the State of South Carolina
My Commission Expires: May 6 2031

