**Exhibit 2**
to  Affidavit of Felix Mirando (ECF No. 63-2)



## RESELLER AGREEMENT

**THIS RESELLER AGREEMENT** (the "**Agreement**") is made and entered into as of the date last signed in the signature section below (the "**Effective Date**") between TBG Tech Co., LLC, a Florida limited liability company, located at 1111 Lincoln Rd., Miami Beach, FL 33139 ("**Company**"), and applya Corporation, a Delaware corporation, located at 131 Falls Street, Suite #301, Greenville, SC 29601 ("**Reseller**").

**WHEREAS**, Company is a consignee and authorized distributor of personal protective equipment (PPE) for Kingfa Science & Tech Co. Ltd ("**Kingfa**"), BYD Global Healthcare Products Solutions LLC ("**BYD**") and Skymed Sdn Bhdand ("**Skymed**"), and provider of software solutions for contact tracing and exit and entry control, and intends to advertise, promote, market, and distribute/sell Products within the territory of North America; and

**WHEREAS**, Reseller wishes to be appointed a non-exclusive reseller of the Products, and Company is willing to make such appointment on the terms contained herein.

**NOW, THEREFORE**, Company and Reseller hereby agree, for and in consideration of the mutual covenants in this Agreement and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, as follows:

1. **Definitions**. Capitalized terms in this Agreement shall be defined in Exhibit "A". All other capitalized terms are defined in the body of the Agreement.
2. **Company Obligations.**
    2.1.  Appointment of Reseller.
        2.1.1.  Authorization and Appointment. Company hereby authorizes and appoints Reseller, and Reseller accepts the appointment, as an independent, non-exclusive authorized reseller to buy Products from Company and to market, sell, or incorporate for resale Products to Customers in the Territory subject to this Agreement and the General Terms & Conditions of Sale related to each transaction as set forth in Exhibit "B".

1





2.1.2. <u>Restrictions on Appointment</u>. Reseller's authorization from Company to resell Products is limited to the Territory. Company has the ability to increase or reduce the size of the Territory or make changes to the Territory if the Reseller breaches this Agreement, particularly, but not limited to the Reseller's obligations under, Section 3.8. Reseller may not authorize or appoint any dealers, sub-resellers, agents, representatives, subcontractors, or other third parties to advertise, promote, resell, or distribute the Products, except as authorized in writing by the Company, unless such agents are operating in the name and under the auspices of the Reseller. All rights not specifically granted by Company hereunder are reserved by Company. Without limiting the generality of the foregoing, Company reserves the right to advertise, promote, market, and distribute the Products, and to appoint third parties to advertise, promote, market, and distribute the Products worldwide, including in the Territory.

2.1.3. <u>Revision of Authorization</u>. Company shall list the current Products and current Product prices at any given time. Reseller accepts and understands that Company reserves the right at any time and from time to time during the Term of this Agreement, to modify or revise any or all of the Products (and related prices) it offers, or to discontinue any Product, support of the distribution, sale or licensing of any or all of the Products without liability of any kind. Company will not retroactively alter prices of available Products for any purchase orders already submitted and accepted by Company. Company will notify the Reseller of such revisions.

2.2. <u>Promotional Materials</u>. Company will provide Reseller with such initial quantities of Promotional Materials (in English) pertaining to Products (e.g., catalogs, promotional literature) as Company deems appropriate in its sole discretion in electronic form. Reseller may translate these materials at its own expense into the local languages of the Territory, but hereby assign to Company ownership of all resulting copyrights and other Intellectual Property rights in such translated materials. Company holds the authority to review and must approve any translated versions or variants of any Promotional Materials and or specifications the

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



Reseller has prepared prior to Reseller's publication or distribution, and Reseller hereby agrees to indemnify and defend Company against any and all claims attributable to such translated materials to the extent caused by Reseller's negligence, inaccuracy of translation or willful misconduct. If Reseller wishes to use or distribute marketing materials not supplied by Company for the Products, Reseller must first obtain Company's written permission prior to any such use or distribution, which Company may grant or withhold at Company's sole discretion.

3. **Obligations of Reseller**.

    3.1. <u>Best Efforts</u>.

        3.1.1. <u>Minimum Purchases</u>.  Reseller shall use its best efforts to market, advertise, and otherwise promote and sell Products in the Territory as made available for sale by Company.  Reseller shall purchase a sufficient amount of Products from Company so as to meet or exceed the minimum purchase requirements set forth below. For the purposes of this provision, a "**purchase**" of Products within a specified time period shall mean buying not less than the quantity of Products specified below.

            3.1.1.1. <u>Gloves</u>.

                3.1.1.1.1. Regarding gloves, Reseller will contract to purchase Kingfa gloves at 3.5 million per month based upon a guaranteed rate of 2.5 million boxes of 100 gloves each per month as further set forth below for a period of not less than one year.

                    3.1.1.1.1.1. Reseller will have an option to reduce their order quantity to 2.5 million boxes from 3.5 million boxes for any given forthcoming month(s)) which must be exercised by written notice no less than sixty (60) days before delivery of the products to U.S. ports (typically Long Beach/Los Angeles).

            3.1.1.2. <u>Face Masks or Other Personal Protective Equipment</u>. Regarding other Kingfa, BYD, and Skymed (Healthy Glove) personal protective equipment, particularly face masks (and not Kingfa gloves), Reseller will contract a total number of such specific Products during the Initial Term as agreed below.



Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



          3.1.1.2.1.    Not less than aggregate purchases of $20,000,000 during the year.

    3.1.2.  <u>Failure to Meet Minimum</u>. Failure to meet such minimum requirements by Reseller shall constitute a material breach of this Agreement for the purposes of Section 10 thereof.

3.2.    <u>Reporting</u>. Reseller shall provide Company with simple written monthly reports, which shall include customer development updates, business trends, planning news of Reseller's primary Customers in the Territory, market forecasts, and other reports reasonably requested by Company, including without limitation reports required for regulatory purposes. The reports will be used by the Company for the following purposes and any additional purpose the Company may elect, providing however no purpose that conflicts with the other terms of this Agreement:

    3.2.1.    Planning and supply chain management,

    3.2.2.    Expansion plans for Reseller's in areas not covered by the Reseller,

    3.2.3.    Protection of the Reseller from circumvention,

    3.2.4.    Reseller assistance in business development, and

    3.2.5.    Apprising Company stakeholders and investors of business growth.

3.3.    <u>Reseller Independent Contractor</u>. Reseller's relationship with Company will be that of an independent contractor and nothing in this Agreement should be construed to create any agency, partnership, joint venture, or employee-employer relationship.

3.4.    <u>Reseller Compliance</u>. Reseller is responsible for Reseller's own consents, certifications, permits, and other authorizations, including all approvals as are required to perform Reseller's duties lawfully and competently under this Agreement under the Laws of the Territory.

3.5.    <u>Reseller Recommendations</u>. Reseller must only recommend and offer information about Products to end users and to Reseller's staff/employees according to Promotional Materials provided by the Company.

3.6.    <u>Employee Training</u>. Reseller shall ensure that any of its employees who are responsible for the marketing, sales, and technical support of the Products have proper skill, training, and background to do their jobs in a competent and professional manner.

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



3.7.   Contact Info. Reseller must keep Reseller contact information and email current with the Company.

3.8.   Marketing Practices by Reseller.

    3.8.1.   The Reseller shall perform independent marketing to promote the sale of the Products under its own independent control providing that such marketing: (i) at all times, represents each brand in compliance with the brand style guide, or (ii) is approved for use in writing by the Company.

    3.8.2.   The Reseller agrees that Reseller shall perform marketing at all times in good faith hereunder in an ethical and honest manner and in accordance with this Agreement and any guidelines issued by the Company. Reseller will: (i) conduct business in a professional manner that reflects favorably at all times on the Products and the good name, goodwill, and reputation of Company; (ii) avoid deceptive, misleading, or unethical practices that are or might be detrimental to Company, the Products or the public, including but not limited to the disparagement of Company or the Products; (iii) make no false or misleading representation with respect to Company or the Products; and (iv) make no representations with respect to Company or the Products that are inconsistent with Promotional Materials, including all liability limitations and disclaimers contained in such materials. Such a breach of this Section 3.8 shall be a material breach of this Agreement.

3.9.   Cooperation. Reseller agrees to work closely with Company and use its best efforts to meet the sales goal mutually agreed between Reseller and Company.

4.   **Price and Payment**.

4.1.   Glove Prices to Reseller. The price of each Kingfa box of 100 general purpose and non-sterile medical gloves shall be Nine Dollars U.S. Dollars ($9.00 USD) ("**Price**").

4.2.   Face Mask Prices to Reseller. Regarding other personal protective equipment, face masks, the price of each face mask shall be agreed upon by the parties.

    4.2.1.   Quantities of >10,000,000 type ASTM III face masks will be Ten Cents ($0.10)  per mask (200,000 boxes of fifty (50) masks MOQ) per Kingfa (only) brand.

5 of 29



Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



4.2.2.   Quantities of >1,000,000 type N95 Surgical face masks will be One Dollar and Sixty-Two Cents ($1.62) per mask (fifty thousand (50,000) boxes of twenty (20) masks MOQ) per model #DE2326.

4.2.3.   Quantities of >1,000,000 type N95 NIOSH face masks will be $1.50 cents/mask (fifty thousand (50,000) boxes of twenty (20 masks MOQ) per model #DE2322.

4.3.   Price Adjustment. Reseller acknowledges that the Company has the right to modify any or all of the Product prices at any time due to customary market price adjustment. There will be no change in price by the Company of an order already placed.

4.4.   Security Deposit. A fifteen percent (15%) security deposit of the minimum order quantity ("**MOQ**") (i.e., a standing security deposit of Three Million Three Hundred Seventy-Five Thousand U.S. Dollars ($3,375,000 USD) from a calculation of 2,500,000 x $9.00 x 15%.) by the Reseller will be held by the Company.

4.4.1.   The security deposit will be paid from credit held on account (including, but not limited to, uncompleted deals transferred in writing) and also Reseller providing the additional funds as required. The entire security deposit will be held during the length of the Agreement and adjusted to reflect Reseller purchase demand.  Notwithstanding the foregoing, applya will not be required to increase its security deposit beyond the amount transferred under this Section from uncompleted deals until such time as Company completes the first delivery of not less than one million (1,000,000) boxes of 100 count (or greater) gloves.

4.4.2.   The parties to this Agreement acknowledge and agree that time is of the essence and that in the event that Company fails to deliver MOQ within a thirty (30) day period of the estimated delivery date, Reseller may at its sole discretion notify Company in writing to its failure to deliver and following a sixty (60) day cure period, and thereafter may terminate the Agreement and receive its security deposit back in full after settlement of any payments due for Product pursuant to Section 10.4.

4.5.   Standby Letter of Credit. A Standby Letter of Credit ("**SBLC**") will back the production on the following basis:



Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



4.5.1.    An SBLC in the amount of Forty One Million, Six Hundred Twenty Five Thousand U.S. Dollars ($41,625,000 USD) will be provided for the term of the Agreement.

4.5.2.    The SBLC is calculated on the following basis:

    4.5.2.1.    Gross SBLC to backstop the five million (5,000.000) boxes (which is two (2) months of MOQ; and

    4.5.2.2.    Terms of the SBLC will prohibit it from being drawn by the Company except in the event of a payment default by the Reseller.

    4.5.2.3.    Terms of SBLC will provide that Company continues to ship product up to eighty-five percent (85%) of the value of the SBLC.

4.6.    Reseller shall receive trade payment terms that require one hundred percent (100%) of funds due within ten (10) days or less after availability of goods in 3PL warehouse USA for pickup or ten (10) days after shipment if Company ships the products for Reseller.

4.7.    Company shall offer delivery and trucking options from port to delivery point at an extra cost throughout all (fifty) 50 states if required (subject to prevailing rates).

4.8.    The security deposit will not be used in the settlement of the Reseller's account balance except for the last payment of the Term or except for Reseller's material breach of non-payment pursuant to terms of Section 10.4.

4.8.1.    During the first twelve (12) months of the Term, the security deposit will be forfeited by the Reseller to the Company in the event that  all of the following occur:

    4.8.1.1.    Reseller fails to accept delivery of MOQ upon written notice of availability by the Company;

    4.8.1.2.    After such failure to accept delivery, written notice is provided by the Company to the Reseller of their failure to accept delivery; and

    4.8.1.3.    Following such written notice, a grace period of thirty (30) days is provided to the Reseller by the Company to accept delivery of the MOQ.

4.9.    The SBLC will not be called (drawn down) unless the Reseller breaches the payment terms of a sale ten (10) days net) and thereafter fails to cure after thirty (30) days written notice by the Company or their agents

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



pursuant to the terms of Section 10.4.

4.10. The Price does not include any allowance for payment of commissions to Kori Capital Inc., aka Gramercy Capital Group LLC, aka Edward Kass and it will be Reseller's responsibility to compensate said party(ies) and any associated affiliates, unless otherwise specified in writing.

5. **Shipment and Delivery**.

5.1. <u>Delivery</u>. Delivery shall be DDP Los Angeles in accordance with Section 4.6. Company will deliver the Products in accordance with the instructions provided by the Reseller at an extra cost upon written request under a purchase order provided by the Reseller to the Company.

5.2. <u>Failure or Delay in Delivery</u>. In case Company cannot meet the estimated delivery date and/or the delivery date specified in the purchase order, Company shall promptly notify Reseller, and discuss in good faith on the new appropriate delivery date. Company shall not be liable for failure to deliver or for any delay or effort in delivery of Product beyond the obligation to refund the purchase price of any undelivered Product.

5.3. <u>Risk of Loss</u>. Title, risk of loss, theft, and damage shall pass to the recipient upon delivery of Product to the delivery address set forth in each purchase order.

5.4. <u>Return Policy</u>. There is no return policy for purchased Products or services by Reseller.

6. **Intellectual Property Rights and Licensing**.

6.1. <u>Intellectual Property Ownership</u>. Reseller hereby agrees and acknowledges that Company shall retain all rights to distribute Products, including related Promotional Materials. Reseller shall have no rights with respect thereto other than the limited use rights or other rights expressly set forth in this Agreement. Reseller shall have no claim or right in Intellectual Property, and Reseller shall not make any claim or contest in the use of any such Intellectual Property. Except as expressly authorized in writing by Company, Reseller shall not file or attempt to register or file any Intellectual Property. Reseller shall not remove, alter or otherwise modify (i) any copyright, trademark or other notices of proprietary interest or Intellectual Property restrictions contained in the Products, and/or Promotional Materials, or (ii) any other Company markings, notices or Intellectual Property that appear on the Products or packaging of the Products.



Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



6.2. <u>Trademark License</u>. Company grants Reseller a non-exclusive, non-transferable, non-sublicensable, non-assignable right and license during the Term of this Agreement, to use the then-current Product names, trademarks, logos, and other marks (including Brand Attributes) ("**Marks**") on the Products solely in connection with Reseller performance of this Agreement. All other uses not approved in writing by Company shall constitute a breach of the Agreement.

6.3. <u>Copyright License</u>. Company grants Reseller a non-exclusive, non-transferable, non-sublicensable right and license during the Term of this Agreement to use the Promotional Materials solely in performance of Reseller performance of the Agreement. All other uses not approved in writing by the Company constitute a breach of the Agreement.

7. **Representations and Warranties.**

7.1. <u>Mutual</u>. Each party represents and warrants to the other that: (i) it has the right and power to enter into this Agreement and to fulfill its obligations hereunder; (ii) entering into, and performance of its obligations under this Agreement does not and will not violate (breach or default), and is not inconsistent with, any agreements between such party and any third parties or any applicable Laws; (iii) this Agreement constitutes a legal, valid, and binding obligation, enforceable against the parties according to its terms; (iv) it is not under any restriction or obligation that it could reasonably expect might affect its performance of its obligations under this Agreement; (v) there are no legal proceedings or claims pending, threatened, or foreseeable against it, which would affect its ability to complete its obligations under this Agreement; (vi) it has not taken or authorized any proceedings related to a bankruptcy, insolvency, liquidation, dissolution, or winding up; and (vii) it shall comply with the requirements of any and all Laws (having jurisdiction over such party or the activities of such party contemplated by this Agreement) in order to perform the obligations, representations, or warranties of the Agreement.

7.2. <u>Product Warranty</u>.

7.2.1. <u>Limited Warranty--Pass Through Warranties</u>. Each Product is covered by a limited warranty. Reseller acknowledges that all components of the Products are being produced for Company by manufacturers or other entities other than the Company. Company extends to Reseller the warranties as to such components provided by such other entities to Company for the

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



length of time that such warranty remains valid for Company. Notwithstanding any other provision in this Agreement, Company shall not be held responsible for any damage which may result from a defective Product except for the replacement of such Product if the limited warranty still applies.

7.2.1.1. <u>Good Faith Claims</u>. Reseller shall act in good faith and not make frivolous or unsupported warranty claims. Fraudulent warranty claims will be cause for immediate breach of this Agreement.

7.2.1.2. <u>DISCLAIMER</u>. EXCEPT FOR THIS SECTION 7, COMPANY DOES NOT MAKE ANY WARRANTY REGARDING THE PRODUCTS, WHICH INCLUDES THAT COMPANY DISCLAIMS TO THE FULLEST EXTENT AUTHORIZED BY LAW ANY AND ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR USE AND NON-INFRINGEMENT. FURTHER, EXCEPT FOR THE LIMITED WARRANTY DETAILED IN SECTION 7, COMPANY SHALL PROVIDE PRODUCTS "AS IS" WITHOUT ANY WARRANTIES, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR USE OR NON-INFRINGEMENT. THIS SECTION 7.2 STATES COMPANY'S ENTIRE LIABILITY AND RESELLER'S SOLE REMEDY FOR BREACHES OF ANY WARRANTIES APPLICABLE TO THE PRODUCTS.

7.2.1.3. <u>Modification of Products</u>. Reseller may not customize, modify, or have customized or modified any Product unless it obtains the prior written consent of Company, which consent may be withheld in the sole discretion of Company.

8. **Insurance**. Reseller shall maintain all business, property, and liability insurance necessary to protect Reseller against the foreseeable risks applicable to Reseller's performance and obligations (including Reseller's indemnities) under this Agreement, and upon Company's request shall provide Company with



Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



evidence of Reseller's insurance coverage and name the Company as a co-insured.

9.  **Confidential Information**.

9.1. Reseller will make no use of Confidential Information for any purpose except as expressly authorized by this Agreement. Except as expressly provided in this Agreement, Reseller will not disclose Confidential Information to any third party and will protect and treat all Confidential Information with the same degree of care as it uses to protect its own confidential information of like importance, but in no event with less than reasonable care. Except as expressly provided in this Agreement, Reseller will not use, make, or have made any copies of Confidential Information, in whole or in part, without the prior written authorization of the Company. Each Representative of Reseller, performing duties hereunder, shall be made aware of this Agreement and shall execute a document that binds said Representative of Reseller to the same level of confidentiality contained herein.

9.2. Confidential Information shall not include information received from Company that the Reseller can show

(i) is or becomes generally known or publicly available through no fault of the Reseller;

(ii) is known by or in the possession of the Reseller prior to its disclosure, as evidenced by business records, and is not subject to restriction;

(iii) is lawfully obtained from a third party who has the right to make such disclosure;

(iv) is at any time developed independently by Reseller or its Subsidiaries; or

(v) is disclosed pursuant to a lawful requirement of a governmental agency or to a court order in connection with a judicial proceeding, but then only to the extent so required or ordered; in such case, Reseller will use reasonable efforts to timely advise Company prior to disclosure so that Company will have an opportunity to seek a protective order or other appropriate relief. Further, the Reseller will cooperate with the Company in taking appropriate protective measures and will make such disclosure in a fashion that maximizes protection of such information from further disclosure.

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



9.3. Reseller shall not reproduce or store any Confidential Information, in whole or in part, without the prior written consent of Company.

9.4. Upon termination of this Agreement, Reseller thereafter will not use or disclose any Confidential Information received from Company, and will promptly return each and every copy thereof, whether in written or electronic form or will promptly destroy the same together with all documents and materials which contain or are based upon such Confidential Information. Reseller will furnish Company with an affidavit of a corporate officer or equivalent thereof certifying that Reseller has complied with its obligations under the preceding sentence. If Reseller is an individual, then an affidavit from the Reseller shall suffice. This Section 9 will survive the termination of this Agreement.

10. **Term and Termination**.

10.1. <u>Term</u>. This Agreement shall commence on the Effective Date and will remain in full force and effect for an initial term of three (3) years, unless earlier terminated under this Agreement ("**Initial Term**").

10.2. <u>Renewal</u>. The Term shall automatically renew for one successive renewal term of one (1) year ("**Renewal Term**") unless either party provides written notice of termination at least sixty (60) days prior to the expiration of the Initial Term or Renewal Term, as the case may be, or unless earlier terminated in accordance with this Section 10 herein. Such renewal is also subject to mutual agreement by both parties on terms regarding Product pricing and Product sales growth of the Reseller (i.e., minimum growth of 5%) terms for the Renewal Term unless otherwise agree in writing. Further, Company shall track Reseller's selling performance over the Initial term "**Term**" shall mean the Initial Term and all other Renewal Terms put together.

10.3. <u>Termination without Cause</u>. Either party may terminate this Agreement without cause upon ninety (90) days prior written notice to the other party after the Initial Term. However, any purchase obligations made by the Reseller will be honored by the parties including the payment provisions thereto.

10.4. <u>Termination for Cause</u>. Either party may terminate this Agreement, effective immediately upon written notice to the other party if:

(i) the other party materially breaches any term of this Agreement and fails to cure such breach, which is a curable breach, within



Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



thirty (30) days after receipt of the non-breaching party's written notice of such breach;

(ii)    the other party materially breaches any term of this Agreement which is not capable of cure;

(iii)    the other party dissolves, becomes insolvent, or makes a general assignment for the benefit of its creditors;

(iv)    a voluntary or involuntary petition or proceeding is commenced by or against the other party under federal, state, or foreign bankruptcy laws; or

(v)    the other party becomes insolvent, is unable to pay its debts as they become due or ceases to conduct business in the normal course.

Termination of this Agreement under this Section 10 will be without prejudice to any other remedy which may be available to a party under applicable Law.

10.5.    <u>Effects of Termination</u>. Upon any termination or expiration of this Agreement:

10.5.1.    Reseller shall cease to be an authorized reseller of Product and all rights and licenses granted to Reseller hereunder shall cease; and

10.5.2.    Reseller shall immediately:

(i) discontinue all sale and associated marketing, advertising, and representation as a Reseller of the Products with the sole exception in connection with the sale of Reseller inventory; and

(ii) not advertise, market or display any trademark, trade name, or product designation which is, in whole or in part, similar to or confusing with the Marks or with any other trademarks owned by the Company or licensed to Company.

10.5.3.    <u>Continuing Obligations</u>.

10.5.3.1.    <u>Reseller</u>. The termination of this Agreement shall not release Reseller from the obligation to pay any sum that Reseller may then owe to Company, or from Reseller's obligation to perform any other duty to distribute the Products prior to the effective date of the termination or to discharge any other liability incurred by Reseller prior thereto.



Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



10.5.3.2.   Company.  The termination of this Agreement shall not release Company from the warranties in this Agreement or from any obligation to fulfill purchase orders which have not yet been delivered ("**Work in Progress**") unless Company refunds monies paid with respect of Work in Progress in full.  In a case where the Work in Progress is completely refunded, the Company will be released from any obligation to deliver the Product associated with such Work in Progress.

10.5.4.   No Liability for Termination. Neither party will be liable for any damages arising out of the termination of this Agreement in accordance with this Section 10. Reseller acknowledges and agrees that Company is not responsible for Reseller's dependence on revenues hereunder. and Reseller agrees to release, hold harmless and indemnify Company from any and all claims and liabilities relating to Reseller's revenues, financial forecasts or economic value that may result from any termination by Company of this Agreement as permitted hereunder.

11.   **Indemnification**.

11.1.   Indemnity. Reseller shall indemnify and hold harmless Company and its members, managers, officers, agents, employees, successors and assigns of each (individually, "**Indemnified Party**") from any and all third-party claims, suits, proceedings, judgments, losses, damages, and costs (including reasonable attorneys' fees and expenses of any nature incurred by the Indemnified Party) (collectively "**Claims**") based on, arising out of or resulting from: (i) any acts, errors or omissions of Reseller (including its officers, directors, members, managers, agents, and personnel if applicable) relating to its activities in connection with this Agreement; (ii) Reseller's breach of this Agreement (including its warranties, representations, and obligations); (iii) Reseller's misrepresentations relating to the Company, Products, or this Agreement, regardless of the form of action; (iv) Reseller's use, disclosure, or misappropriation of any Confidential Information; or (v) Reseller's gross negligence or willful misconduct.  The indemnities in this Section 11 will not be limited by the insurance requirements of this



Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



Agreement and extend to Claims occurring after the Term of the Agreement.

11.2.   <u>Notices and Procedures.</u> Subject to the limitations set forth herein, Reseller, at its own expense, shall (i) defend, or at its option settle, any claim, suit, or proceeding against the Indemnified Party for which it has an indemnification obligation under this Agreement; and (ii) pay any final judgment entered or settlement against the Indemnified Party in any such suit or proceeding defended by Reseller; so long as the Indemnified Party gives Reseller prompt written notice of such claim, suit, or proceeding and the right to control and direct the investigation, preparation, defense and settlement of such claim. An Indemnified Party shall reasonably cooperate with Reseller, who shall not take any action to settle or defend any such claim, suit, or proceeding that would in any manner impose obligations (monetary or otherwise) on an Indemnified Party without the Indemnified Party's written consent, not to be unreasonably withheld. An Indemnified Party has the right to participate in the defense of any claim with its own counsel and is responsible for all costs associated therewith.

12.   **LIMITATION OF LIABILITY**. COMPANY SHALL NOT BE LIABLE TO RESELLER OR THIRD PARTY FOR (I) ANY CONSEQUENTIAL, INDIRECT, SPECIAL, INCIDENTAL, RELIANCE, OR EXEMPLARY DAMAGES, (II) COST OF PROCUREMENT OF SUBSTITUTE GOODS, SERVICES, RIGHTS, OR TECHNOLOGY BY RESELLER, AND (III) LOSS OF REVENUES, LOSS OF PROFITS, AND LOST REPUTATIONS, HOWEVER CAUSED AND, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR UNDER ANY OTHER THEORY OF LIABILITY, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND EVEN IF ANY EXCLUSIVE REMEDY PROVIDED FOR HEREIN COMPANY OF ITS ESSENTIAL PURPOSE. NOTWITHSTANDING THE FOREGOING, RESELLER, AND COMPANY HEREBY IRREVOCABLY AGREE THAT UNDER NO CIRCUMSTANCES SHALL COMPANY'S TOTAL LIABILITY TO RESELLER ARISING OUT OF OR RELATED TO THIS AGREEMENT (INCLUDING ALL CLAIMS OF ANY KIND) SHALL NOT EXCEED THE AMOUNT PAID OR PAYABLE BY RESELLER TO COMPANY FOR THE PRODUCTS AND PROFESSIONAL SERVICES IN THE PRECEDING ONE (1) MONTH PRIOR TO THE CLAIM, IN EACH CASE, ARISING FROM OR RELATING TO THIS AGREEMENT.

13.   **General Provisions.**




Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



13.1.   <u>Notice</u>. Any notices or other communications required or permitted hereunder shall be electronically in writing and confirmed received by the receiving party or personally delivered at the principal business addresses designated at the beginning of this Agreement, or mailed by registered or certified mail, return receipt requested, postage prepaid, at the address set forth above, or to such other address or addresses as may be hereafter furnished by one party to the other party in compliance with the terms hereof.

13.2.   <u>Assignment</u>. The parties may not assign this Agreement or any right or obligation of this Agreement, in whole or in part, by operation of law or otherwise without prior written consent of the party, which shall not be unreasonably withheld.  Any attempted assignment, subcontract or other transfer of this Agreement or any of Reseller's rights or obligations hereunder by Reseller will be void ab initio and will be considered a material breach of this Agreement. Notwithstanding the foregoing, Company may assign this Agreement, upon notice to Reseller, to a related or unrelated Person in connection with a transfer of all or substantially all of its stock (or equivalent) or assets to a third party or in the event of a merger, and Reseller hereby consents to such assignment in advance. This Agreement shall inure to the benefit of and be binding upon any successor or assign of Reseller.

13.3.   <u>Severability</u>. If any provision of this Agreement is found to be invalid or unenforceable in any jurisdiction: (i) the validity or enforceability of such provision shall not in any way be affected in respect of any other jurisdiction and the validity and enforceability of the remaining provisions shall not be affected, unless this Agreement reasonably fails in its essential purpose; and (ii) the parties shall replace such provision by one or more valid and enforceable provisions approximating the original provision as closely as possible.

13.4.   <u>Headings</u>. Regarding this Section, headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

13.5.   <u>Interpretation</u>. In construing or interpreting this Agreement, the word "or" shall not be construed as exclusive, and the word "including" shall not be limiting. The parties agree that this Agreement shall be fairly interpreted in accordance with its terms without any strict construction in favor of or

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



against either party and that ambiguities shall not be interpreted against the drafting party.

13.6. <u>Amendments</u>. No change or modification of this Agreement will be valid unless it is in writing and signed by each party to this Agreement.

13.7. <u>No Waiver</u>. A party's failure to exercise or delay in exercising any right, power or privilege under this Agreement shall not operate as a waiver, nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof.

13.8. <u>Force Majeure</u>. Neither party will be liable for failure or delay to perform obligations under this Agreement, which have become practicably impossible because of circumstances beyond the reasonable control of the applicable party. Such circumstances include without limitation natural disasters or acts of God; acts of terrorism; labor disputes or stoppages; war; government acts or orders; COVID-19, new epidemics, new pandemics or new outbreaks of communicable disease; quarantines; national or regional emergencies; or any other cause, whether similar in kind to the foregoing or otherwise, beyond the party's reasonable control. Written notice of a party's failure or delay in performance due to force majeure must be given to the other party no later than two (2) business days following the force majeure event commencing, which notice shall describe the force majeure event and the actions taken to minimize the impact thereof and or as such regulated by law.

13.9. <u>Equitable Relief</u>. Reseller acknowledges that any breach or threatened breach of this Agreement involving an unauthorized use of Confidential Information or Intellectual Property will result in irreparable harm to Company for which damages would not be an adequate remedy, and therefore, in addition to its rights and remedies otherwise available at Law, Company will be entitled to seek injunctive or other equitable relief, as appropriate, and Reseller hereby waives the right to require Company to post a bond. If Company seeks injunctive or other equitable relief in the event of a breach or threatened breach of this Agreement by Reseller involving an unauthorized use of Confidential Information or Intellectual Property, Reseller agrees that it will not allege in any such proceeding that Company's remedy at law is adequate. If Company seeks any equitable remedies, it will not be precluded or prevented from

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



seeking remedies at law, nor will Company be deemed to have made an election of remedies.

13.10.  Governing Law. Any dispute, controversy, or controversy, or claim of whatever nature arising out of or relating to this Agreement or breach thereof shall be governed by and interpreted under the laws of the State of Florida and the federal laws of the United States of America applicable therein, without regard to conflict of law principles.

13.11.  Dispute Resolution. The parties shall always endeavor to resolve any and all disputes arising in the performance of the contract by communication and dialogue before advancing to legal recourse. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall exclusively be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The place of arbitration shall be Miami Beach, Miami-Dade County, Florida. The number of arbitrator(s) shall be one (1), and shall be selected by mutual agreement of the parties from a choice of up to three (3) arbitrators, such selection being an arbitrator proposed by each party for consideration. In the event of disagreement between the parties of selecting the arbitrator,  an additional and final arbitrator selection (a third arbitrator selected for consideration) shall be chosen and agreed upon by both parties, such selection of arbitrator not to be unreasonably withheld and to be concluded within ten (10) business days.  The arbitration shall be conducted in English. The arbitrator shall be entitled to issue injunctive and other equitable relief. Notwithstanding anything herein to the contrary, a party may apply to any court with jurisdiction for interim or conservatory relief, including without limitation a proceeding to compel arbitration. The parties agree to arbitrate all disputes arising from this Agreement on an individual basis (and in strict accordance to this paragraph) and each party waives the right to participate in a class action arbitration against any other party. Outside of the seeking of injunctive relief or other equitable relief in strict compliance with this paragraph, prior to engaging in arbitration, the parties shall seek to resolve their differences through: (i) at least two meetings or teleconferences between/among party principals or their representatives within seven (7) days of when the dispute arises; and (ii)

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



at least one session of non-binding mediation within forty-five (45) days, with the mediator's professional services fee to be borne equally by the parties and the mediator being chosen/agreed to mutually between the parties.

13.12.   Attorney's Fees.  Should any action be brought by either party to enforce the provisions of this Agreement against the other party to this Agreement, the prevailing party, whether by settlement, adjudication or arbitration, shall have the right to collect reasonable attorneys' fees, expenses, and costs from the non-prevailing party.

13.13.   Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

13.14.   Entire Agreement. This Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes and terminates all other prior commitments, arrangements, or understandings, both oral and written, between the parties with respect thereto.

13.15.   No Third-Party Beneficiaries. The provisions of this Agreement are for the sole benefit of Company and Reseller and their successors and permitted assigns, and they will not be construed as conferring any rights to any third party (including any third-party beneficiary rights).

13.16.   Survival of Terms. Expiration or termination of this Agreement shall not relieve either party of any obligations that accrued prior to the date of such expiration or termination. The provisions of Sections 4, 6, 7.1.(vii), 7.2, 8, 9, 10.5, 11, 12, and 13 survive the expiration or termination of this Agreement for any reason.

13.17.   Publicity. Subject to the terms and conditions of Section 9 above, neither party may publicize or disclose to any third party, without the written consent of the other party, the existence or terms of this Agreement. In the event that Company becomes aware that disclosure is likely to be required by operation of law, Company shall promptly provide Reseller with ample and opportunity to seek a protective order. Without limiting the generality of the foregoing sentence, no press releases may be made without the prior mutual written consent of each party.

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



13.18.   <u>Mutual Non-Disparagement</u>. Each party agrees to conduct itself always in a professional manner and agrees neither to, directly or indirectly, make any statement disparaging or criticizing in any way the other party or any of the other party's business activities, strategic partners, or affiliates, nor engage in any other conduct or make any other negative statement that could be reasonably expected to impair the goodwill or the reputation of the other party in any manner, in each case, except to the extent required by law, and then only after prior notice to the other party that gives the other party a reasonable opportunity to endeavor to enforce this Agreement before such statement is made.

**[SPACE LEFT INTENTIONALLY BLANK]**



Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

**COMPANY**                                    **RESELLER**

**TBG Tech Co., LLC**                          **applya Corporation**

By: _____    By: _____

Name: Johannes "Jay" Floe          Name: _John Sanders_____

Title: _Member_____   Title: ___CFO_____

Signed on_2021 / 02 / 23_____   Signed on_2021 / 02 / 23_____

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



<u>**EXHIBIT A**</u>
<u>**DEFINITIONS**</u>

The following definitions apply to capitalized terms in this Agreement. All other capitalized terms are defined in the body of the Agreement.

1. "**Agreement**" shall have the same meaning set forth in the first paragraph of the Agreement.

2. "**Brand Attributes**" mean any trademarks, trade dress, graphics, packaging designs and artwork, and other branding Intellectual Property associated with the Company's brand and labels. Brand Attributes can be found on the Products (or its packaging) and embodied in the Promotional Materials.

3. "**BYD**" shall have the same meaning set forth in the recitals of the Agreement.

4. "**Claims**" shall have the same meaning set forth in Section 11.1.

5. "**Company**" shall have the same meaning set forth in the first paragraph of the Agreement.

6. "**Confidential Information**" includes (without limitation) any trade secrets, data or information relating to the business of Company, its service providers or its Asian manufacturers which would reasonably be considered to be proprietary to Company, its service providers, and its Asian manufacturers including, but not limited to, electronic communications, contacts (including, but not limited to, emails, phone numbers, and lists of buyers, sellers, brokers, customers, suppliers, vendors, and end users) supplied by one party to the other ("Contact(s)"), accounting records, any Contact records, and any information that is not generally known in the industry of the parties and where the release of that Confidential Information could reasonably be expected to cause harm to any parties.  Confidential Information may also include (i) any personally identifiable data or information regarding any end user; (ii) proprietary product-related technology, ideas, and algorithms; (iii)



Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



Intellectual Property; (iv) Company's technical, business, or financial information and plans; (v) the terms and conditions of this Agreement; and (vi) any notes, extracts, analyses or materials prepared by Reseller which are copies of or derivative works of the information of this definition or from which information of this definition can be inferred or otherwise understood.

7. "**Customer**" means any Person (third party) that buys a Product or Products solely for his, her, or its own internal use, rather than for resale or distribution.

8. "**Effective Date**" shall have the same meaning set forth in the first paragraph of the Agreement.

9. "**Force Majeure**" shall have the same meaning set forth in Section 13.8.

10. "**Governmental Authority**" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

11. "**Indemnified Party**" shall have the same meaning set forth in Section 11.1.

12. "**Initial Term**" shall have the same meaning set forth in Section 10.1.

13. "**Intellectual Property**" means any and all of the following Company owned:

> (i) Marks, service marks, trade dress, corporate names and other indications of origin, including all applications and registrations (including any modifications, extensions or renewals) in any jurisdiction, and the goodwill connected with the use of and symbolized by the foregoing,

23 of 29



(ii) copyrights, including all applications and registrations (including any modifications, extensions or renewals) in any jurisdiction related to the foregoing, and

(iii) other intellectual property and related proprietary rights, interests, and protections (including all rights to sue and recover and retain damages, costs and attorneys' fees for past, present, and future infringement, and any other rights relating to any of the foregoing).

14. "**Kingfa**" shall have the same meaning set forth in the recitals of the Agreement.

15. "**Law**" means

(i) any law (including the common law), statute, bylaw, rule, regulation, order, ordinance, treaty, decree, judgment, and

(ii) any official directive, protocol, code, guideline, notice, approval, order, policy, or other requirements of any Governmental Authority having the force of law.

16. "**Marks**" shall have the same meaning set forth in Section 6.2.

17. "**MOQ**" shall have the same meaning set forth in Section 4.4.

18. "**Person**" means an individual, a general or limited partnership, a corporation, a trust, a joint venture, an unincorporated organization, a limited liability entity, any other entity, and any Governmental Authority.

19. "**Product(s)**" means personal protective equipment, including gloves and face masks, in each case of good and merchantable quality, and in compliance with published manufacturer's specifications with manufacturing origin being as represented in each invoice and/or supporting paperwork, as issued by the Company and further to the foregoing, in the case of gloves with North American SGS certification, unless declined in writing by Reseller, and in each case, as described in Section 3.1.1.1.

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



20. "**Promotional Materials**" means any advertising, marketing, informational, specifications, certifications or promotional materials with respect to the Product.

21. "**Purchase**" shall have the same meaning set forth in Section 3.1.1.

22. "**Renewal Term**" shall have the same meaning set forth in Section 10.2.

23. "**Representative(s)**" shall mean associates, directors, managers, members, officers, employees, consultants, and agents.

24. "**Reseller**" shall have the same meaning set forth in the first paragraph of the Agreement.

25. "**SBLC**" shall have the same meaning set forth in the Section 4.5 of the Agreement.

26. "**Skymed**" shall have the same meaning set forth in the recitals of the Agreement.

27. "**Subsidiary(ies)**" means a company which is controlled by another company (its holding company). Whether or not one company is a subsidiary of another depends effectively on whether the other company:

   (i)     holds a majority of the voting rights;

   (ii)    is a member and has the right to appoint or remove a majority of the directors; or

   (iii)   is a member and controls, alone, under an agreement with other members, a majority of the voting rights.

28. "**Term**" shall have the same meaning set forth in Section 10.2.

29. "**Territory**" means the United States of America.

30. "**Work in Progress**" shall have the same meaning set forth in Section 10.5.3.2.

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



# EXHIBIT B

## GENERAL TERMS AND CONDITIONS OF SALE

1. Due to limited supplies, product on all purchase orders are subject to availability with product allocation based on monthly committed demand, expansion of sales allocations beyond committed amounts will be based upon past performance.
2. All sales are deemed as final.
3. No returns or exchanges accepted.

### GENERAL

The Reseller identified on the purchase order ("Purchaser") agrees to purchase the products identified in the purchase order from TBG ("Seller"). By purchasing products with purchase order or signed estimate ("Order") from TBG, you agree to be bound by and accept the terms and conditions contained herein and in the Reseller Agreement (collectively this "Agreement").

This Agreement does not supersede, waive, or otherwise affect any guarantees, credit application, or other agreements between Purchaser and Seller. While the Seller may acknowledge receipt of this Order by a replied email or verbal communication, Seller reserves the right to modify quantity based on availability. While Seller is to supply products identified in the Order, Seller may allocate its available supply amount any or all of its various customers upon such bases as Seller shall deem fair and practicable, with no liability on its part for failure to deliver the quantity or any portion therein specified on the Order. Seller reserves the right to refuse acceptance of Orders from anyone. Seller reserves the right at any time, even after receipt of an order confirmation, to decline or cancel Order or to limit order quantities for any reason, including errors or suspected fraud.

### PRICE
Prices are subject to change by Seller without notice. Any cost incurred by Seller in connection with or arising out of the manufacture, sales, or distribution of product, including but not limited to, increase in labor, freight,

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



and material cost prior to shipment, may be invoiced to Purchaser.   Pricing errors may occur on items sold by Seller. Seller attempts to correct all pricing errors promptly after discovery. Seller reserves the right to cancel any orders containing pricing errors, with no further obligations to Purchase, even after receipt of an order confirmation or shipping notice from Seller. Any payments you make to Seller for orders that are cancelled due to pricing errors will be refunded.   Seller may process payment for and ship parts of an order separately.

**SHIPMENT & DELIVERY**
Orders are not binding upon Seller until accepted by Seller. Seller reserves the right to refuse acceptance of Orders from anyone. Seller will indicate its acceptance of an order by issuing an invoice or by shipping the ordered product to Purchaser. All shipments are made as FOB of Seller's declared warehouse point unless otherwise specified.   In the absence of specific instructions by Purchaser, Seller selects the carrier when shipping is being arranged by the Seller. Quoted delivery date or ship period are approximate and not binding. In cases of force delays (e.g. acts of war, accidents, transport disruptions, strikes, lockouts, etc.) and in cases of labor, energy, or raw material shortage or governmental orders, Seller shall, without liability for damages, be released from the obligation to meet delivery dates.   In the event of such delay or threatened delay, Seller shall promptly give notice to Buyer and Buyer may, at its option, either excuse such delivery/performance of services or cancel such purchase order in whole or in part. Buyer shall pay the prices specified in the purchase order for any goods completed prior to the effective date of such cancellation and delivered to Buyer in conformance with these Terms and Conditions.

**PAYMENT**
Purchaser shall be bound by all terms and conditions from Seller. Seller shall issue a separate invoice for each separate shipment. Each invoice shall include Purchase Order Number, Seller's item numbers, quantities shipped, and invoiced price. The invoice shall be paid within ten (10) days of receipt and acceptance of goods when backed by an SBLC and prior to shipment if not backed by an SBLC. All payments shall be made in full in accordance with payments terms on invoice, via ACH direct, or other payment forms acceptable to Seller.   In the event the Seller obtains material evidence that

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



the Buyer is a credit risk the Seller shall have the right to declare all invoices immediately due and payable. Delinquency to payments due on invoice shall allow Seller to exercise rights to hold unshipped orders from Purchaser until delinquent payments are collected.

**RETENTION OF TITLE**

Products sold shall remain the property of Seller until all debts have been paid. The Purchaser shall keep the goods delivered subject to retention of title securely in safe custody on behalf of Seller free of charge. Title to Products and risk of loss pass to Purchaser upon delivery thereof by Seller to the carrier or delivery service.

**WARRANTY**

In addition to all warranties implied by law and any express warranties provided by Seller, Seller warrants that all Products and all services performed in connection with this Agreement will conform to all drawings, samples or other descriptions furnished or specified by Seller. Warranty will conform to the specifications furnished, specified or approved by Seller and will be merchantable and fit for their intended purpose, be of high quality and free from defects in design, material, and workmanship.

**RETURNS**

Purchaser agrees that any product that is returned will be handled in accordance with, and shall be subject to, Seller's Return Policy. Exchange is optional based on product availability and material evidence acceptable to the Seller's manufacturer/supplier that the product being returned was out of specification and non-conformant to published and warranted specifications and covered by warranty. Purchaser must contact the Seller for approval prior to arrangement of return or exchange and must not return any item for exchange without an RMA (return materials authorization).

**RECALLS**

Seller will initiate a recall of a Product if Seller reasonably determines a recall to be advisable or if required by any applicable law, governmental rule or regulation. Purchaser will immediately notify Seller in writing of any recall of a Product initiated by third party act of law and not initiated by the Seller. Purchaser will cooperate fully with Seller in effectuating the recall.

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f



**GOVERNING LAW AND DISPUTE RESOLUTION**

This Agreement and all communications, disputes and performance related hereto shall be governed by and construed according to the internal laws of the State of Florida. Purchaser and Seller shall meet in good faith to attempt to resolve informally any disputes arising out of this Agreement. Purchaser agrees that all information on purchase order, this Agreement, and Reseller's purchase terms, including, but not limited to, price, are confidential and may not be disclosed to third parties and are governed further by the Reseller Agreement.

In the event there is a conflict between these General Terms & Conditions of Sale and the Reseller Agreement, the Reseller Agreement shall govern.

29 of 29

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f

## ASSIGNMENT AND RELEASE AGREEMENT

**THIS AGREEMENT** ("**Agreement**") is entered into as of February 23, 2021, by and among Enmark, Inc., a California corporation, located at 27762 Antonio Pkwy, Suite #L1-645, Ladera Ranch, California 92694 ("**Enmark**"), TBG Tech Co., LLC, a Florida limited liability company, located at 1111 Lincoln Rd. Miami Beach, FL 33139 ("**TBG**"), applya Corporation, a Delaware corporation, located at 131 Falls Street, Suite #301, Greenville, SC 29601 ("**applya**"), and Justin Brown Attorney At Law, located at 31103 Rancho Viejo Road #D-2, Suite 153, San Juan Capistrano, California 92675 ("**JB**").

**WHEREAS,** applya paid security deposits to Enmark with respect to certain PPE transactions to be held by the JB IOLTA trust accounts, collectively and represented in **Exhibit A**;

**WHEREAS,** TBG has received security deposits from Enmark in the total amount of $2,459,579.40;

**WHEREAS,** Enmark retains $151,670.52 in the JB IOLTA trust accounts (the "**Retained Sum**"); and

**WHEREAS,** TBG and applya have entered a Reseller Agreement, dated February 23, 2021, between applya and TBG ("**Reseller Agreement**").

**NOW THEREFORE,** in consideration of the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Enmark will cause JB to transfer the Retained Sum to the TBG account as represented in Exhibit A.
2. JB shall be released by applya from all obligations of the IOLTA Trust Agreements, including Amended and Restated IOLTA Trust Agreement, dated November 4, 2020, by and among JB, applya, and Enmark, and IOLTA Trust Agreement, dated December 19, 2020, by and among JB, applya, and Enmark ("**IOLTA Trust Agreements**") with immediate effect.
3. Enmark releases JB from all obligations with respect to all IOLTA Trust Agreements with immediate effect.
4. Enmark and applya immediately release each other from all obligations of all outstanding purchase order supply agreements with each other with immediate effect.
5. TBG confirms upon receipt of the Retained Sum that it will hold security deposits of $2,611,249.92, and such security deposits are held on behalf of applya by TBG, subject to the terms of the Reseller Agreement including, but not limited to, Section 4.4.1 of the Reseller Agreement.
6. Enmark releases TBG from any liens, encumbrances, and claims that TBG holds regarding the security deposits on behalf of Enmark as represented in Exhibit A (especially all purchase order supply agreements) and transfers all rights and title to such security deposits to TBG under the ratification of this legal instrument.
7. JB releases applya and Enmark from all obligations under the IOLTA Trust Agreements.
8. TBG hereby agrees that this Agreement and the process of assigning Enmark purchase order deposits to applya shall not reset or delay any obligation for TBG to perform the action to deliver PPE previously offered for sale by TBG for eventual delivery to applya including, V-Gloves when and if they become available for sale, Di-Line or their equivalent FDA 510(k) replacement and Kingfa gloves.
9. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their successors and assigns.
10. The covenants and conditions contained in the Agreement shall apply to and bind the parties and their heirs, legal representatives, successors, and permitted assigns.
11. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida not including its conflict of laws rules that would refer to the laws of another jurisdiction.
12. The failure of the parties to enforce any provisions of this Agreement shall not be deemed a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.
13. This Agreement may be executed in one or more counterparts, each bearing the signatures of one or more parties. Each counterpart shall be considered an original and all of the counterparts shall constitute a single

1

Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f

agreement binding all the parties as if all had signed a single document. For purposes of executing this Agreement, a document signed and transmitted by electronic means (such as in PDF format via e-mail or via facsimile machine) is to be treated as an original document. The signature of any party thereon, for purposes hereof, is to be considered as an original signature, and the document transmitted is to be considered to have the same binding effect as an original signature on an original document.

14. The parties agree to act in good faith and to cooperate fully with each other in carrying out the intent of this Agreement, and for that purpose agree to execute all additional documents as may prove reasonably necessary to accomplish that intent.

15. The parties shall each bear their own costs and attorney fees incurred in connection with this Agreement, and each waives the right to make a claim against the other for such costs, attorney fees or any other expenses associated with the matters herein.

16. Each party agrees to defend, indemnify and hold harmless the other parties from any claims, obligations, or other liabilities, including specifically attorney's fees and costs incurred, which result from the assertion by any third party of a right to any claim which is released by this Agreement.

17. This Agreement, together with the Reseller Agreement, is the entire, final, and complete agreement of the parties relating to the subject of this Agreement, and supersedes and replaces all prior or existing written and oral agreements between the Parties or their representatives relating thereto. No amendment or modification of this Agreement shall be effective unless in a writing executed by all parties whose interests are affected by the modification.

18. The unenforceability or invalidity of any clause in this Agreement shall not have an impact on the enforceability or validity of any other clause. Any unenforceable or invalid clause shall be regarded as removed from this Agreement to the extent of its unenforceability and invalidity. Therefore, this Agreement shall be interpreted and enforced as if it did not contain the said clause to the extent of its unenforceability and invalidity.

**[SPACE LEFT INTENTIONALLY BLANK]**



Doc ID: d764c675d36721c6a1c5900a5a462cbf84e8964f

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

Enmark, Inc.

*Jonathan Phillips*
_____
Signature

By:  Jonathan Philips

Its:  CEO


TBG Tech Co., LLC

_____
Signature

By:  Jay Floe

Its:  Member


applya Corporation

_____
Signature

By:  John Sanders

Its:  CFO


Justin Brown Attorney At Law

_____
Signature

By: Justin Brown

3

**EXHIBIT A**

**ASSIGNMENT OF SECURITY DEPOSIT**

  

4

## EXHIBIT A - SECURITY DEPOSIT TRANSFER EXHIBIT

| DATE | ACCOUNT | IOLTA ACCOUNT # | EVENT | EVENT RELATED ACCOUNT | IOLTA TRANSACTION AMOUNT | SECURITY DEPOSIT($) HELD BY TBG TECH CO |
|---|---|---|---|---|---|---|
| 11/05/2020 | IOLTA TRUST ACCOUNT # | Wells Fargo | Applys inbound wire to IOLTA | CITI NATIONAL BANK WIRE | $1,861,249.92 | $0.00 |
| 11/05/2020 | IOLTA TRUST ACCOUNT # | Wells Fargo | Wire to TBG Tech Co as Security Deposit | T.D. Account | -$412,079.40 | $412,079.40 |
| 11/05/2020 | IOLTA TRUST ACCOUNT # | Wells Fargo | Wire to TBG Tech Co as Security Deposit | T.D. Account | -$1,297,500.00 | $1,297,500.00 |
| 01/24/2021 | IOLTA TRUST ACCOUNT # | Wells Fargo | Applys inbound wire to IOLTA | BANK OF AMERICA WIRE | $750,000.00 | |
| 01/24/2021 | IOLTA TRUST ACCOUNT # | Wells Fargo | Wire to TBG Tech Co as Security Deposit | T.D. Account | -$750,000.00 | $750,000.00 |
| | | | | CURRENT SECURITY DEPOSIT HELD BY TBG TECH CO FEB 22 2021 ON BEHALF OF ENMARK INC. | | $2,459,579.40 |
| 02/22/2021 | TBG TECH CO ACCOUNT | T.D. Account | Total Security Deposit held at this date | | | |
| FUTURE TRANSACTION UPON SIGNING OF RESELLER AGREEMENT AND ASSIGNMENT | IOLTA BALANCE TO BE TRANSFERRED TO TBG TECH CO | | Upon execution of the Assignment and associated Reseller Agreement, the IOLTA Trust agent will move funds to TBG Tech Co as represented on behalf of applys | | | |
| | | Wells Fargo | | T.D. Account | -$151,670.52 | $151,670.52 |
| | | | | ENDING TBG TECH CO BALANCE HELD AS SECURITY DEPOSIT AFTER TRANSFER | | $2,611,249.92 |
| | | | | applys security deposit required under the Reseller Agreement | | $3,375,000.00 |
| At time of first 1 million products traded | applys transfer to TBG Tech Co remaining contracted security deposit | T.D. Account | Applys future inbound wire to TBG TECH CO | BANK OF AMERICA WIRE FROM APPLYA | -$763,750.08 | $763,750.08 |




 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Reseller Agreement (between TBG and applya) and Assignment...... |
| **FILE NAME** | TBG Reselle...a Final.pdf and 1 other |
| **DOCUMENT ID** | d764c675d36721c6a1c5900a5a462cbf84e8964f |
| **AUDIT TRAIL DATE FORMAT** | YYYY / MM / DD |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| ⟳ **SENT** | **2021 / 02 / 23** 23:46:42 UTC | Sent for signature to Jay Floe (jay@tbgtechco.com), John Sanders (john@applya.com), Jonathan Philips (getjrpnow@gmail.com) and Justin Brown (jbrown@justinbrownesq.com) from justin@enmarkinc.com IP: 216.70.191.235 |
| ⊙ **VIEWED** | **2021 / 02 / 23** 23:48:00 UTC | Viewed by Jay Floe (jay@tbgtechco.com) IP: 68.230.145.206 |
| ⊙ **VIEWED** | **2021 / 02 / 23** 23:49:34 UTC | Viewed by Justin Brown (jbrown@justinbrownesq.com) IP: 216.70.191.235 |
| ⟋ **SIGNED** | **2021 / 02 / 23** 23:51:32 UTC | Signed by Justin Brown (jbrown@justinbrownesq.com) IP: 216.70.191.235 |
| ⟋ **SIGNED** | **2021 / 02 / 23** 23:53:14 UTC | Signed by Jay Floe (jay@tbgtechco.com) IP: 68.230.145.206 |

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Reseller Agreement (between TBG and applya) and Assignment...... |
| **FILE NAME** | TBG Reselle...a Final.pdf and 1 other |
| **DOCUMENT ID** | d764c675d36721c6a1c5900a5a462cbf84e8964f |
| **AUDIT TRAIL DATE FORMAT** | YYYY / MM / DD |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| **VIEWED** | **2021 / 02 / 24** 03:10:10 UTC | Viewed by Jonathan Philips (getjrpnow@gmail.com) IP: 172.58.19.159 |
| **SIGNED** | **2021 / 02 / 24** 03:11:02 UTC | Signed by Jonathan Philips (getjrpnow@gmail.com) IP: 172.58.19.159 |
| **VIEWED** | **2021 / 02 / 24** 03:14:43 UTC | Viewed by John Sanders (john@applya.com) IP: 174.194.209.81 |
| **SIGNED** | **2021 / 02 / 24** 03:44:55 UTC | Signed by John Sanders (john@applya.com) IP: 174.194.209.81 |
| **COMPLETED** | **2021 / 02 / 24** 03:44:55 UTC | The document has been completed. |